## Waite v. Commonwealth

*Joseph E. Favuzza,* for petitioner.

*Richard M. Sharp,* for Sheriff of Centre County.

*Frank P. Lawley, Jr.,* Deputy Attorney General and *David Stahl,* Attorney General, for Commonwealth.

CAMPBELL, P. J., January 16, 1962.—The Commonwealth of Pennsylvania maintains its State Correctional Institution at Rockview within the confines of Centre County. Being a minimum security institution, prisoners therein confined do from time to time escape. A conflict of opinion has existed for some time between the prison authorities at Rockview and the sheriff of Centre County as to their duties, responsibilities and right of custody and control over a prisoner after his capture and return to the institution. Two prisoners, Robert N. Frankhouser and Robert C. McKee, were sentenced by this court for the crime of prison breach (18 PS §4309). They were returned to Rockview where the correctional officers retained custody. The sheriff of Centre County filed a petition with this court requesting an order compelling the State correctional officers at that institution to deliver the prisoners to

him so that he might transport them to the western correctional diagnostic and classification center at the Western Penitentiary at Pittsburgh. The question squarely before the court is the procedure to be followed following the apprehension and arrest of an escaped prisoner from the institution.

The sheriff contends that the crime of prison breach is a substantive offense and a separate and distinct crime which occurs within the jurisdiction of this court, and as such defendant should be dealt with by the officials of this county in the same manner as any other defendant who has committed a crime within this jurisdiction. The sheriff further contends that pursuant to the Act of April 23, 1829, P. L. 341, section 8, art. 5 (61 PS §373), every convict sentenced to imprisonment in the penitentiary shall, immediately after the sentence shall have been finally pronounced, be conveyed by the sheriff of the county in which he was condemned to the penitentiary, and further pursuant to section 3 of the Act of July 29, 1953, P. L. 1435, as amended (61 PS §913), the prisoner should be delivered to the appropriate correctional diagnostic and classification center. This act provides in part as follows:

"Every person hereinafter sentenced by any court in this Commonwealth to a State institution shall be sent to and received by . . . the Western Correctional Diagnostic and Classification Center, if sentenced from a county in the Western District. . . ."

Centre County is within the western district.

While sheriff's counsel did not contend or call to our attention the Act of February 28, 1933, P. L. 3, sec. 2, as amended (19 PS §1233), this act does lend some support to the sheriff's position. It provides as follows:

"The cost of transporting escaped persons, prisoners, and convicts from the place of capture to the correc-

tional institution, penitentiary, or reformatory after being sentenced for such escape, or for the commission of any crime or offense following such escape and before apprehension, the cost of maintenance while confined in the county jail awaiting trial, as well as the costs of the trial for escape or breaking away of persons, convicts, and prisoners from the several penitentiaries, correctional institutions, and reformatories in the Commonwealth of Pennsylvania, or the violation by said persons, convicts, and prisoners of any or all of the penal statutes relating to escape, or of the trial for crime and offenses committed after such escape and before apprehension, or of the trial for crimes and offenses committed on the grounds or within the buildings of the correctional institution, penitentiary, or reformatory, as well as the costs incurred in any proceedings on writs of habeas corpus, coram nobis or other petitions arising out of any escape or crime or the trial therefore, or in any appeals of any such proceedings or trials, shall in each instance be borne and paid by the respective counties of the Commonwealth from whose courts the said persons, convicts, and prisoners shall have been originally committed to the said penitentiaries, correctional institutions, or reformatories.

"The county liable for such costs, as above provided, shall, upon bills rendered by the county paying such costs in the first instance, pay to such county the amount of such costs."

This act contemplates that the cost of transporting a prisoner to the penitentiary after sentence for escape or after sentence for another crime following the prisoner's escape, the cost of maintenance while confined in the county jail awaiting trial, the cost of the trial, the costs of trials for offenses committed on prison grounds, the cost of writs of habeas corpus, coram

nobis or other petitions shall be paid by the counties originally sentencing the prisoners who shall reimburse the county paying the costs. This would, in our opinion, logically support the contention that the escaped prisoner would be under the jurisdiction of the county where the crime was committed, in this case the County of Centre, else why would the county be liable originally for such costs? We do believe, however, that the real intent and purpose of this act was to dispose of the troublesome question of liability for costs and that the act does not attempt to set up a system of procedure or to make any of the practices referred to mandatory.

Counsel for the sheriff in conclusion argues that the crime of prison breach is a separate substantive offense and that the punishment therefor is not merely incidental to the original offense and follows irrespective of the purpose of commitment at the time of escape and that an escaped convict should be handled in the same manner as any other person convicted of a crime in Centre County. We do not quarrel with the contention that prison breach is a separate substantive offense. See Commonwealth ex rel. Dailey v. Myers, 186 Pa. Superior 176; Commonwealth ex rel. Stimeling v. Day, 5 Cumberland 189; Commonwealth ex rel. Myers v. Johnston, 69 Dauph. 281. But we firmly believe that this fact is not controlling nor is the ultimate decision in this case contrary to such holding.

While the reasoning of the petitioning sheriff appears initially to be sound, we believe that it fails to take into consideration the Act of June 21, 1939, P. L. 660. sec. 1, as amended (19 PS §1245), which provides as follows:

"In all cases where a prisoner or convict, after an escape from a penitentiary or other state correctional institution, is apprehended or arrested by any officer having authority to make such arrest, the said officer

shall notify the penitentiary or state institution from which the escape was made, which institution shall notify the Department of Justice or the Pennsylvania State Police, who shall immediately send an officer or officers to return the prisoner to the penitentiary or state institution."

We believe that this act provides for a different procedure for the handling of escaped prisoners and directs that escaped prisoners shall be returned to the institution from which they escaped and not to the county jail as would ordinarily be done to one commiting a crime within the jurisdiction of this court.

There are other very significant statutes which we believe shed considerable light on the question before us. The Act of July 29, 1953, P. L. 1445, sec. 1 (18 PS §4309), dealing with sentences for the crime of prison breach, provides inter alia as follows:

"Said sentence shall commence from the expiration of the original sentence and any other sentences pre-viously imposed which remained to be served at the time the offense of prison breach was committed."

Since the sentence for prison breach is served following the sentence or sentences imposed upon the prisoner at the time of his escape, it is important to note the Act of July 29, 1953, P. L. 1435, sec. 4, as amended (61 PS §914), wherein the deputy commissioner for treatment is given complete authority to make transfers from any State institutions under the control and supervision of the Department of Justice to any other such institution.

The procedure hereinafter outlined by the court involves a final statute relating to sentencing. It is the Act of May 28, 1937, P. L. 1036, sec. 1 (19 PS §894), which provides as follows:

"From and after the passage of this act, all sentences for criminal offenses of persons who at the time sen-

tence is imposed are held in custody in default of bail, or otherwise, shall begin to run and be computed from the date of commitment for the offense for which said sentence shall be imposed, unless the person sentenced shall then be undergoing imprisonment under a sentence imposed for any other offense or offenses, in which case the said sentence shall begin to run and be computed, either from the date of imposition thereof or from the expiration of such other sentence or sentences, as the court shall, in its discretion, direct."

In the instant case, the court gave credit on account of the prison breach sentences for the time between the prisoner's apprehension for escape and the date of the court sentence on the theory that defendants after their capture were not serving on their previous sentence to the penitentiary. This has been an established practice of the author of this opinion as well as his predecessors in office. We now believe this to be in error and subsequent sentences will be drafted in conformity with the procedure hereinafter outlined.

We believe it is possible to establish a procedure which will be in conformity with all of the statutes previously set forth and which will resolve any apparent inconsistencies appearing therein. Chronologically, this procedure is as follows.

When a prisoner gains his temporary freedom by escaping he immediately ceases to be given credit on account of the sentence he was serving prior to his escape. Upon his apprehension and capture he is to be returned, not to the county jail, but to the prison from which he escaped (19 PS §1245, supra). Immediately upon his return, he begins to receive credit on the sentence he was serving prior to his escape. We are informed that this is the established and customary practice of the Bureau of Corrections of the Department of Justice. The prison officials, if they desire to

prosecute, make an information before a justice of the peace and by reason of their custodial powers should transport the prisoner to the justice of the peace for the preliminary hearing and upon conclusion thereof return him to the institution. During all of this time he is still serving and being given credit for the sentence he was serving prior to his escape. The justice of the peace returns his transcript which forms the basis for the indictment to be drawn by the district attorney. At this point the prisoner is still confined in the institution and still receiving credit on a previously imposed sentence but his status has changed only in that he now has an untried or undisposed indictment against him.

The Act of June 28, 1957, P. L. 428 (19 PS §881-84), sets up a complete procedure for the disposition of untried indictments against prisoners. Section 4 thereof provides as follows:

"The costs of transporting any prisoner between the place of his confinement and the county wherein the untried indictment is pending shall be borne by the said county. It shall be the responsibilty of the Sheriff (or his deputy) of the said county to transport such prisoner."

Therefore, when the captured prisoner indicates that he wants to enter a plea of guilty or to stand trial on an indictment for prison breach, he so advises the prison officials who notify the district attorney of the county of his intention. The district attorney in turn notifies the sheriff of Centre County when and where to pick up the prisoner and to deliver him to court for disposition of the indictment. Following the disposition of the indictment, whether by plea of guilty or trial, and after sentence, if such is required, the sheriff of the county will return the prisoner to the institution from which he secured him.

Because of the proximity of the State Correctional Institution at Rockview to the county seat, and if the prisoner desires to stand trial, we would hold that the sheriff should return him to Rockview when the court is not in session unless the court for practical reasons. should order otherwise. This same procedure should be applicable for the prosecution and sentencing for any crime committed by an escaped prisoner before his capture.

We have now reached the crux of the issue in this case. The sheriff contends that he should be permitted to transport the prisoner to the correctional diagnostic and classification center in Pittsburgh because of the Acts of April 23, 1829, P. L. 341, and July 29, 1953, P. L. 1435, as set forth above. We hold not for the following reasons.

The sentence imposed by the court cannot begin or be effective until the expiration of the original sentence or sentences which the prisoner was serving at the time of his escape. (Act of July 29, 1953, P. L. 1435, sec. 1, supra.) At the time of the disposition of the indictment for prison breach, defendant is serving a prior sentence and over such person the deputy commissioner for treatment has complete authority to make transfers (Act of July 29, 1953, P. L. 1435, supra.) If he chose, defendant would remain at the institution at Rockview or be transferred to any other State correctional institution. The sentences of the defendants in this case specifically state that they should be effective on the expiration of the existing sentences. We do not believe that the law ever intends that a useless or absurd thing be done or be used to accomplish a ridiculous result. Why should the sheriff of Centre County secure a prisoner at Rockview in Centre County in order to dispose of an untried indictment and then deliver him. to the correctional diagnostic and classification center

at Pittsburgh days, months or even years prior to the time specified in the sentence of the court when the sentence was to begin?

The technical question might be raised that the sheriff would have the right to the custody of the prisoner at the completion of his prior sentences in order to deliver him to the correctional diagnostic and classification center at Pittsburgh. We would answer this question likewise in the negative. The bureau of corrections in charge of our penal system maintains a system of transportation for exchanging prisoners, which we are informed operates on a weekly basis. This method of inter-institution transfer is both practical and economical. We see no reason why the taxpayers' money should be unnecessarily consumed by furnishing two men and a car and requiring them to travel 300 miles to deliver a prisoner to Pittsburgh when the prisoner is already under the control of the bureau of corrections, which operates the diagnostic and classification center. To require the sheriff to ascertain the expiration dates of prior sentences of prisoners and then maintain a tickler file so that he might go, for example, to Philadelphia to take a prisoner to the western correctional diagnostic and classification center at Pittsburgh when his prior sentence had been served is not within the contemplation of the statutes. Once a prisoner is delivered to the jurisdiction and control of the bureau of corrections, it is the bureau's duty to see that he serves all sentences imposed upon the prisoner by any court or courts and to determine where such sentences shall be served.

We do not intend that this opinion will make any change in the existing procedure for the disposing of untried indictments which would include the situation where the escapee commits a crime prior to his capture. We believe in these cases that the sheriff is entitled to pick up the defendant where incarcerated and after

the indictment is disposed of to return this prisoner to the same institution.

While not involved in this case we would like to call to the attention of the authorities, however, that the use of the inter-institutional transportation system for the exchange of prisoners could be profitably used to assist individual counties in disposing of untried indictments against prisoners already confined. For example, a prisoner in Philadelphia desiring an untried indictment to be disposed of in Centre County should be transported by the bureau to the nearest correctional institution, in this case Rockview, in order to save extensive costs and inconvenience. If statutory authority is needed, it should be promptly sought.

Since the indictments for prison breach against both of the prisoners in this case have been disposed of by pleas of guilty and sentences and the prisoners returned to the institution from which they were secured, we are of the opinion that the sheriff of Centre County is entitled to no further custody thereof and for the reasons set forth in this opinion we enter the following order.

And now, January 16, 1962, the petition is dismissed and by reason of the fact that this proceeding was intended to settle a troublesome procedural question, the costs thereof shall be paid by the County of Centre.